The case under advisement is well-argued. We will take our next case, which is Estate of Andrea Arrington v. John Michael. Your Honors, may it please the Court, my name is Suzanne McDonough, and I represent John Michael, a City of Chester police officer. I have asked to reserve four minutes for rebuttal. This is the most troubling case that probably ever will become in front of this Court, and it should be, because it's the most radical departure from existing law that is imaginable. We have a situation here where the trial court decided that every time a police officer comes home from work and takes his weapon, disassembles it, and stores it by taking it into pieces and placing it in hidden locations all over his bedroom, and then puts a lock on it so that it's completely inoperable, and then locks it behind a deadbolted bedroom door, that that is an act under color of law that can at some point expose him to liability. Now, in this particular case, the police officer in question happened to have a son who became deranged. Yeah, and we're well familiar with the facts, Ms. McDonough. So let me take you, if I can, sort of jump over the qualified immunity for a moment and talk about the statutory immunity piece of this, the child safety lock statute. Yes, Your Honor. Was there any argument at all from your opposing counsel about negligence per se or negligent entrustment with respect to that statute? No, sir. No, sir. And there was no finding by the district court either. The district court, and I don't quite understand how the district court got there, said that if a gun ever becomes operable, the statute doesn't apply. If the gun ever could become operable through any means, that it would be a jury question as to whether it was safely stored. I don't really get that. I mean, we didn't argue. We weren't doing a Second Amendment case, but if we were, all the statutes that have been before the United States Supreme Court, where they talk about operability of a firearm, which have been, by the way, overturned as a violation of the Second Amendment, inoperable meant disassembled or locked. Okay. You say inoperable under the statute means what happened here. Well, that's what the judge decided, that inoperable meant it could never be operated, ever. Which means you would never have a suit for it because it wasn't operable at all. And you'd never have to have a statute. To protect it. To protect. And that's the other thing. The judge, Judge Joyner, felt that a jury should always decide what's enough safety, what's enough security. That a single deadbolt wasn't enough. Now, that's not even required by anyone. Okay. You're back to qualified immunity. Stay with me on this. Oh, no, I meant the gun safety statute doesn't require it. That's what I meant. Okay. Whose burden would it be, if this were being analyzed, to demonstrate there was negligence per se or negligent entrustment? Would it be on the gun owner to say, to prove I did these things and, therefore, I wasn't negligent per se and it wasn't negligent entrustment? Or, having shown that you had the lock on the gun, would the burden fall on the person who's making the claim to demonstrate negligence per se or negligent entrustment? I believe the way the statute is written, the burden would be on the person saying that the immunity did not apply. Because it says there will be no cause of action. You can't file one. So, in order to say, I have a right to file one, you have to be able to say, I have a right to file one because of negligence per se. And then you have to go to a statute, an ordinance, a law that says it's going to be negligence per se. In this case, how could it be negligence per se to lock your gun up in the fashion in which this was locked? Well, it was in accordance with police procedures. More than that. Even more so than that. Police procedures didn't require that you take it completely apart and hide everything in all these different places and then that you install a deadbolt on your bedroom door. And this is not a deadbolt where you just jimmy the door or I could use my foot and kick it and it would open. This door had to be seared off. I mean, if you look at the picture in the record, this door was literally broken down by someone in utter rage. Torn off its hinges. Literally. And for this police officer to have to have envisioned that. But I think that the gun safety statute, if you're looking at, and the Supreme Court is looking more at what every reasonable police officer could have imagined, could have known, that would have alerted him that his conduct would have been unlawful. How in the world could John Michael have known that his conduct was unlawful and in violation of constitutional rights? You have the case of Borrella where the police actually hand back the gun to the person who was threatening to shoot his wife with the gun. They give it back to him. Well, the district court seemed to be troubled by the foreseeability piece of this. Now I'm moving back to qualified immunity, I guess. And was concerned that there was a factual issue about foreseeability. Was it foreseeable that if your client left the police report on the table expecting his son to see it, that that would upset him, make him angry? That he had a history of violence and so it was foreseeable that he would respond violently? That in fact with the PFA in place that he had just violated, that informing him of his paramours, having gone to the police and told on him, would in fact enrage him and he would carry out the threat he'd made? That those things were foreseeability factors that a jury ought to have an opportunity to think about and opine on or make a decision on before he could make a qualified immunity decision? What's wrong with that line of reasoning by the district court? What's wrong with it is that on the 17th, three days before John Michael went on his brief vacation, his son called him and said, I'm going to turn myself in as soon as the warrant is issued. He already knew that Andre had gone to the police. He knew what she had told the police. In fact, the only disputed issue of fact in this case that there would be in everything in here that Judge Joyner said is that John Michael left the police report on his table with the letters to his son. There is no evidence in the record of that anywhere. Anywhere. There's no record that that was later? No. No. The only way that Judge Joyner got there was through an inference. The two letters that John left his son on the table were taken upstairs by his son to the old bedroom he used to occupy. The police report ended up there. When the district attorney CID people came and were finding everything, they found not only the two letters that John had written to his son, but the copy of the police report. There's no evidence that John ever left that down on that table in the kitchen. He left the letters down there that said... Is it an unfair inference? I mean, if it's an inference, I guess that's the whole point, right? Even though I accept that inference. Let's accept that inference. That inference would go then to the letters that he wrote to his son. And that's the other thing that Judge Joyner did. He said the police officer writing these letters to his son, that was an act of official, it was an official act to write the letters that said, My son, I love you. Turn yourself in. It's not that bad. I will help you. I will do what I can. That's official misconduct to beg your son to turn yourself in and to say, It's not that bad. You didn't have a weapon. You didn't have a gun. You didn't have anything like this. So even leaving the police report there, Andrea wasn't saying he threw me down when I went to the house. Those are terrifically stated arguments, counsel, and I think what the district judge was saying was those are just the kind of A jury ought to hear you make that pitch because maybe a jury could also infer from the fact that you turned over an official police report. Now, I understand you said it's not in the record, but he's made an inference that your client made it available, that that's something for the jury to be looking at. Why is he wrong about that narrow question about it's a fact issue? I don't think that inferences are facts. When I studied logic, my understanding was that facts were supposed to be facts. If all you have is an inference, do you go to a jury? I don't have any facts to present, ladies and gentlemen, but I have an inference. I will come to you with just one inference, and the inference is that you should infer that this police officer did all of these things because as a psychic he should have known how bad this would have become. I think this is the interesting part of where Judge Joyner went wrong. Stick with me, please. If you've got the police report in the house, in the bedroom where the son was, could a jury rationally infer from the fact that it's with the stuff of the sons? No. The son did not live there. He lived with Andrea for years before this. When I said the bedroom that he used to have, it was when he used to live at home with his father years before. Understood. I'm just trying to follow your logic. You said there's no factual foundation, and you focused on the letters. I'm trying to get to the question I think was in Judge Joyner's concern and have you respond to it. He seems to be concerned not that there isn't an argument you can make, but that there's an argument that could be made on the other side, and the argument that could be made on the other side is there's a police report there. It got there because the father put it there. He shouldn't have put it there. Put it where? In the house. And why? First of all, John Michael was given the police report. He did not request it. That's number one. Number two, the testimony in this case had been that in cases of domestic violence, they rely upon the families. You had an argument earlier where it was why wasn't the family contacted? Why didn't people try? Well, in this case, the superior officers have testified that they rely on the family to try to find the people because they don't know where they are. When they're evicted from their residence, you have to go to the family to try to track them down. So if the captain left the police report for John, who then took it to his own home, is that official misconduct? And if he left it in his home where he did not expect somebody to come in under these circumstances and do what he did, is that official misconduct? Is that an affirmative act? Is that where state-created danger is going these days? Counsel, it seems to me that you're on pretty shaky ground when you try to argue that the judge was wrong in suggesting that foreseeability on these facts would not be a jury question. I mean, it is we frequently ask jurors to decide foreseeability issues. But aren't there elements of the state-created danger doctrine that involve questions that we do not routinely ask juries to decide? Yes, absolutely. Okay. What would those be? Well, in this case, it would be causation. One of the main cases would be causation, the criminal act, responsibility for the criminal act. Causation, that's a typical jury issue. Well, not in this case. It's almost like Paul's graph. Are you talking about the affirmative duty? I'm talking about the affirmative duty. Yeah, what about that? Now, do you – Affirmative act. The judge seemed to think that there were facts here that would allow a jury to decide whether the acts of your client in bringing the gun home, placing the notes on the table, things like that constituted affirmative acts that were consistent with the state-created danger doctrine. Are those – No, it's not, because for 27 years, John Michael brought his gun home and did the same thing with it. And for every day from when the protection from abuse order was requested in this case, July 2nd, John Michael brought his gun home and stewarded it in an identical fashion. Why would a jury get to decide that on every other day from July 2nd to July 20th that John Michael did not commit an unconstitutional act, but on July 20th, when he flew away for a couple of days, he did commit an unconstitutional act in doing the same thing he had done the day before and the day before and the day before that and the day before that? Where does it end? He never would have been able to bring his gun home then. If what they're saying is true and they're alleging that he was this violent creature from many years before, then John Michael would not have been able to have a gun at all, because he always would have known then that if his son would come into his house and break down his door and ransack his room and steal these things, that he was a menace to society. What made it different that day than any other day, any other week, month, year? And can any police officer, after today, tomorrow, whenever these decisions are made, can any police officer bring his gun home? And not have to worry that – You can't ignore that, that your son is under a restraining order. That hasn't been the case for years and days and weeks before. His son was under an agreed-upon restraining order. It was not something – they agreed to it. It was not tried. But he then threatened to cut up his what? That's the allegation. We're presuming he is guilty. He's dead. He can't say he didn't say that. But, yes, we can presume that, I suppose, for purposes. But that makes this case a little different from you're saying he can never bring his gun home. Well, no, because on July 2nd, with the protection of abuse order initially, on June 28th, the victim writes down when she goes to the police on July 2nd, June 28th, he threatened me. He was going to hurt me. June – two years ago, he threw a wine bottle and hit me. Another time, he slapped me and threw me on the bed. She has all these violent acts that he's committed. And yet, when it comes down to violating the protective order, after he's agreed with her to allow it to issue and she's allowing for free visitation for the grandson, then all of a sudden the fact that he says, well, if you tell the police, I'll cut you, John Michael should have known that his service weapon was now in jeopardy. This boy had never, ever touched a gun. He didn't know how to operate a gun. This is not something where the father taught him how to use the gun  What's your best argument, Ms. McDonough? and what he should have known and shouldn't have known and all that. Under the state-created danger doctrine, if you were going to pick something that's not classically a jury question to attack, in this case, in the district court's position, what would it be? It would be that even if you assume that he did something wrong, he never did anything that could arise to the level of shocking the conscience. I guess that would be what it would be. The deliberate indifference. The deliberate indifference that would shock the conscience of the court. How would he have known? How could he foresee? All right. We'll hear from you on rebuttal. Thank you. Hey, police and court. Frank DiMera representing the state of Andrea Arrington. We're here because qualified immunity was denied to the appellant. Qualified immunity would be granted if there was a clearly established right. We're also here because statutory immunity was denied. So I'd like you to start where I asked Ms. McDonough to start by telling me, Mr. DiMera, was the issue of negligence per se or negligent entrustment ever presented to the court below? No, Judge. However... And once the immunity of the statute is invoked, in this case by Officer Michael, whose burden was it to come forward and say, that doesn't work here because it's negligence per se or there was negligent entrustment? Judge, we have not had that opportunity because we did not obviously try this case. The qualified immunity, it was not a final order. I mean, the reason we are here is because of the qualified immunity. I always took that the statutory immunity was simply a defense as to whether it was a clearly established law under qualified immunity analysis. It's a separate, it's a statute. It's a freestanding statute invoked by the defense, which says you can't even bring a suit. So are you saying you didn't have any obligation in the face of that to say that won't apply because... Understood. But the facts that we did present were that the gun, though the statute refers to an inoperable gun, was, as Judge Joyner pointed out, operable. And where the key... Well, it was operable once the safety lock was taken off. That's sort of the point of the statute, right? Yeah. Well, that's where I believe it gets interesting, is that if we take the statute the way it's read, if the key is in the gun lock or if the key is one foot away from the gun lock, is the gun inoperable? It's certainly inoperable until the safety lock is taken off, right? Well, we believe that a jury should decide that issue because when it comes to the inoperability of the gun, the other factors that come in is exactly how was the gun made inoperable and was the inoperability... Well, the statute is inoperable by device, right? It includes that language, by device. By device. Doesn't that really anticipate that someone is using a gun lock, as was done here? How could a jury decide, in a way that a judge wouldn't overturn it, that this was not sufficient inoperability? Tell me what your argument would be to a jury. When you refer to inoperability of the device, because now we have a gun and we have a gun lock, it's not clear when they're referring to the device as whether it means the gun and the gun lock or just the gun alone. Well, it says inoperable by device. Tell me how this could be, how a jury could find that this was not inoperable by device. Judge Joyner made it clear in his decision that because there was ambiguity, he saw ambiguity because of the fact that the statute... Okay, he saw it, we're reviewing it. You tell me how a jury could find ambiguity. What is ambiguous about it? That the gun was actually used. Indeed. Why is it a question for a jury at all? If the question is what does that word mean in a statute, isn't that exactly the kind of question we call a question of law? Yes. Which we reviewed de novo. Okay. So Judge Joyner thought there was something ambiguous about it. Enlighten us. What's ambiguous about the language that says, as has been quoted to you, that it's made inoperable by a device? Inoperable by use of a secure gun storage or safety device. We would argue that that language, a secure safety device, if the key is available, is not a secure safety device, is not being utilized in the way that the statute envisioned. Available. But they were in separate areas within the room. Judge, the gun was in the bedroom, it was allegedly locked, and the key was in the bedroom drawer, I think in a sock. And the gun was up under some linens on the shelf. Yes, and the ammunition, I believe, was in the closet. When you say it was allegedly locked, there's no dispute in the record, is there? The gun lock was on it, right? Well, that's what the appellant is indicating. Was there anything in the record that you can point us to that indicates it's not? I mean, if what you're making now is sort of a factual argument, it's a new one to me. No, Judge, I do not wish to make that argument. The gun was locked. Yes, so the record is the gun was locked, the key was secreted someplace else in the room, and the gun had the safety lock on it. I would just argue it was not securely locked. That's when the statute uses that language, secure, when the statute refers to the key. Because the key was somewhere in the same room. Absolutely. And, Your Honor, again, if you look at the legislative history, Judge Joyner pointed out the one legislature member indicating that it had not changed law. But, you know, we believe that the statute was intended to protect people that used a gun lock on a gun, made it inoperable, and then either the gun lock was made inoperable by some sort of physical force, but not using the key that was present to then just simply unlock the gun lock. But a device has to be able to be taken off in order for the gun to then be operable. So there has to be something whereby the- Well, not the key, though, Your Honor. That's the point we're making. Not to immunize someone against a civil rights violation simply by using the key. If someone's using, you know, some of these locks have cables, they're using a bolt cutter, or someone's bashing it against something, a sledgehammer, but using the key that was actually intended to lock and secure the device was simply left there. Can you tell me, and getting back to qualified immunity, we have a situation here where a person committed two criminal acts before committing a- well, no, broke down the door of the bedroom and then used the gun. Can you give me a case under substantive due process and state-created danger where we have found that someone such as John Michael can be held liable, notwithstanding the fact that a person commits two intervening criminal acts that were not known, and that person is then found, aha, you are- it's state-created danger. Yes, Your Honor. I do not have a case that has those specific facts. However, obviously, as this circuit pointed out in Morrow in June of this year, if you enhance the danger, if the danger is made worse because of something that the appellant did- With an affirmative act. With an affirmative act. All right, what's the affirmative act here? The appellant brought that gun home. He had the discretion not to. He brought it into a house that he knew his son would have undisturbed access because he was on vacation for a week. And he did get that criminal complaint. And that criminal complaint did not just report that Mr. Michael or the son had violated the PFA. It specifically said that he had threatened to cut up his girlfriend, which- Well, Mr. DeMaio, why don't you answer Ms. McDonough's final point? When asked, what's your best shot here, she said, even if- or worse, even if you were wrong, it wasn't shocking to the conscience. It wasn't deliberate indifference. So what's deliberately indifferent about bringing your service revolver home, like you have for your whole career, putting a trigger lock on it, hiding the key, hiding the bullets, deadbolting the door, hiding the key to the deadbolt? Where- what in that series of events should lead a rational jury, if they ever got it, or a judge looking at it from a qualified immunity standpoint to say, well, that's deliberately indifferent. Judge, and the deliberate indifference is exactly the standard we reuse because this was not an unhurried situation like in a car chase. And the deliberate indifference here, if he had just brought that gun home and the key and the ammunition, we would not be alleging a substantive due process violation. What shocks the conscience here is that he brought that gun home knowing that his son would have undisturbed access to that house. He expected his son to come to the house. He knew his son had been convicted of intimidating a witness in a child support hearing in Delaware. But he also knew that his son presumably didn't know how to operate a gun. Your Honor, he also knew his son was a felon. He knew his son had been accused of but then found not guilty of rape. He knew that his son had violated the order and had two counts or had previously had the order that he agreed to. He had two prior violent acts towards us. Which is probably why you deadbolt your door and you do what you do with it. I mean, if you even think about it. But to say it's deliberate indifference when, again, I point out that the son then commits two criminal acts. Your Honor, if he had brought the gun into the house, locked the front door and the son had broken into the front door, again, we would not be alleging a violation of substantive due process. But this was a wooden bedroom door in the house that he knew the son had access to and he knew the son had undisturbed access. The son could have gotten a power saw out. The son could have gotten a sledgehammer. The son was not breaking into a house in daylight in order to get that gun. And he's supposed to anticipate that this would happen. Judge, he's a police officer of 27 years who has responded to domestic violent complaints in the past. He knew his son had just violated a PFA, knew that his son had intimidated a witness before arising from child support. But also knew his son said, I'll surrender as soon as the arrest warrant's out. Your Honor. So it sounds like his son's acting pretty rationally. Your Honor, that telephone conversation, he simply had him and his son had a discussion about, yeah, you should have been somewhere you shouldn't have been. But there was nothing in the record to indicate that the appellant advised his son that he had now intimidated a witness again by threatening to cut her off. And that's taken pretty seriously in a domestic violence, you know, venue. Counsel, most of the state-created danger case with which I am familiar, this goes to the affirmative act question. The affirmative acts take place in the context where there's some kind of ongoing relationship or a relationship, often ongoing,  and the affirmative acts do something that increases the vulnerability of the party with whom the state official has a relationship. Acts are taken which increase the danger to the individual. I'm struggling to see how, in this case, there was any kind of relationship between the officer and the deceased. There was no relationship. Isn't that correct? Well, the officer was a law enforcement official. The victim was a domestic violence victim. And the officer was under an obligation, if he had seen an act directed against her, to arrest the person. I'm not saying he would arrest his son, but that was the obligation he was under. That was the relationship he had. He knew there was a PFA order that forbid his son from possessing or acquiring firearms. But I think Judge Lippa's question is, what was the relationship? Usually it's, okay, the actor has acted affirmatively vis-a-vis the person who ultimately is harmed. What is the relationship here that would suffice? He's providing a domestic violence victim's abuser with a weapon and with the criminal complaint stating that that victim reported the person to the police. Well, that doesn't answer the relationship question, I don't think. It really sounds like you're conflating foreseeability and the relationship. I don't mean to do that, but if we look at the way state-created danger, at least from my readings applied, and following the Knipe elements, she is the person whose danger would increase because of the gun being brought to that home and that criminal complaint. She's the discreet, I mean, that's the victim. But there in Knipe, I mean, the officers put the woman out into the dangerous situation. They act vis-a-vis the person entrusted to them. Except in Knipe, Your Honor, the individual was walking along the highway. The police officers didn't show up. She would have still been subjected maybe to that. Now, not with the husband, but she still would have been subjected to that. But it was the act of what they did to her. Which put her in a more dangerous situation. Exactly. So it enhanced the danger. And we believe that by providing a gun to someone who clearly doesn't care much about a PFA order, who has acts of violence in the past, and who you know has a propensity to violence, that to me, at least we respectfully submit, that would enhance the danger. This was not a general public. This was not, I mean, this was a victim of a crime. This was a law enforcement official. And we believe the relationship, though maybe not as specific as like in a special relationship, in a custodial situation, there's still a relationship. I mean, these are not two ships passing in the night. I mean, that is a law enforcement official, and that is a victim who's seeking protection from an abuser using law enforcement. And instead what happens is this complaint, which he threatens to cut her up, is provided to him. That is, it's always been disturbing for us, and that is why we allege that there's been a violation of the substantive due process, because of the enhanced danger. And it should have been clear to the officer, given his 27 years on the force. Are there any other questions? Thank you. Thank you. I won't belabor this, because I think that the panel understands the arguments very well, but I want you to consider just this. Would every reasonable officer have known that his conduct was unlawful and shocks the conscience of a court? Would every reasonable officer, because that's what the Supreme Court says the standard is, would they have known? Captain Anita Amaro didn't know. The captain who kept her gun in the same fashion. In this particular case, the aunt of the young woman who tragically died kept her gun in the same fashion. In the house outside of which the niece was killed, Judge Joyner mistakenly said that the murder happened at Andrea Arrington's residence, but it was really at the aunt's house, where there was a gun stored in exactly the same fashion, in a closet, in the exact same way, without the benefit of the outside lock on the door. What kind of standard are we going to hold police officers to? This decision by Judge Joyner was made shortly after Sandy Hook. I think that's why it was made. Thank you. Thank you. Counsel, we'll take it. The matter under advisement. Thank you.